REVISED

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 24, 2021

Lyle W. Cayce
Clerk

No. 20-60132

Hassan Raza Mirza,

*Petitioner*,

*versus*

Merrick B. Garland, *U.S. Attorney General*,

*Respondent.*

---

Petition for Review of an Order of the
Board of Immigration Appeals
No. A200 035 095

---

Before Jolly, Stewart, and Oldham, *Circuit Judges*.
Andrew S. Oldham, *Circuit Judge*:

Hassan Mirza threatened to commit a religiously motivated act of terrorism. The Government detained him and ordered him removed. Mirza petitioned for review. We deny the petition.[1]

---

[1] Judge Stewart concurs in the judgment only.

I.

Hassan Mirza was born to a Mohajir family in Karachi, Pakistan. Mirza developed and maintained a close connection with the Mohajir Quami Movement ("MQM") and the Mohajir Student Federation ("MSF"). In 1990, Mirza applied for an F-1 student visa with plans to attend Oklahoma State University. After a few months, Mirza dropped out of classes but remained in the United States. In 1993, he applied for asylum based on the Pakistani Government's oppression of MQM members. The Immigration and Naturalization Service granted asylum in 1997.

On May 10, 2018, Mirza's brother contacted the Amarillo Police Department ("APD") through the crime-stoppers tip line. The brother described Mirza as living on the streets of Houston and suffering from mental illness. He further stated that Mirza called him from a private phone number, and said:

> I am now on Allah's path and I am going to teach a lesson to kuffars [non-believers]. Allah is with me and I am going to kill at least 30 to 50 kuffars. In shah Allah I will be successful and go to heaven. Tell Amee [mother] that her son's on Allah's path and going to heaven.

Mirza angrily concluded, "[s]oon you will all see Amarillo on the news," and disconnected the phone.

APD officers located Mirza and turned him over to FBI agents. During his FBI interview, Mirza admitted to making terroristic threats. APD officers noted that Mirza presented signs of a possible mental illness. So they transferred him to a mental-health treatment facility for observation and evaluation. Mirza's family confirmed the officers' suspicion and informed them of Mirza's history of schizophrenia.

United States Citizenship and Immigration Services ("USCIS") issued a Notice of Intent to Terminate Asylum Status based on Mirza's "recently developed terroristic threats presenting a danger to the United States" in addition to his "previously admitted past involvement with MQM, a group that engages in terrorist like activity" as defined by the Immigration and Nationality Act ("INA"). And thereafter, the hospital transferred Mirza to the custody of Homeland Security Investigations ("HSI") for the initiation of asylum-revocation proceedings.

In those proceedings, the immigration judge ("IJ") found that Mirza "pose[d] a danger to the national security of the United States." Relying on 8 U.S.C. § 1158(b)(2)(A)(iv) and the Attorney General's precedential interpretation of that statute in *Matter of A-H-*, 23 I. & N. 774 (A.G. 2005), the IJ terminated Mirza's asylum status. That made Mirza subject to removal from the United States under 8 U.S.C. § 1158(c)(3).

Mirza conceded his removability. Then he applied to adjust his status to Lawful Permanent Resident ("LPR"). He also applied for a waiver of inadmissibility and deferred removal under the Convention Against Torture. The IJ deemed MQM a Tier III terrorist organization and found that Mirza had been an active member since 1987. That made Mirza inadmissible and hence ineligible for an adjustment of status under the terrorism bar in 8 U.S.C. § 1182(a)(3)(B)(i)(VI). The IJ also found that Mirza failed to prove that he would be tortured based on his Muslim faith or mental illness. The IJ therefore denied Mirza's applications. The BIA affirmed. Mirza timely petitioned for review.

## II.

The first question presented is whether the Government lawfully terminated Mirza's asylum status. That decision turned on 8 U.S.C. § 1158(b)(2)(A)(iv). We first hold that the Attorney General interpreted that

statute correctly as a matter of law. Then we hold the BIA's decision was supported by substantial evidence as a matter of fact.

A.

"We start, of course, with the statutory text." *United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018) (quotation omitted). The INA statutorily bars the Attorney General from granting asylum where there are "reasonable grounds for regarding the alien as a danger to the security of the United States." 8 U.S.C. § 1158(b)(2)(A)(iv). The phrase "reasonable grounds for regarding" is not defined in the INA.

Given the statute's silence, the IJ and the BIA relied on *Matter of A-H-*. In that decision, the Attorney General first determined that the plain meaning of "reasonable grounds" comports with the well-established standard for "probable cause." *See* 23 I. & N. at 788–89. Then the Attorney General determined that "a danger to the security of the United States" means "[a]ny level of danger to national security . . . ; it need not be a 'serious,' 'significant,' or 'grave' danger." *Id.* at 788. The Attorney General based the latter interpretation on the fact that in other contexts, the Government uses the word "serious" to qualify or modify national security provisions—which only highlights its decision not to modify the word "danger" in 8 U.S.C. § 1158(b)(2)(A)(iv). *Ibid.*

The parties spill much ink debating whether we must defer to *Matter of A-H-* under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). In our view, *Chevron* is irrelevant here.[2] That's for two reasons.

---

[2] There is a good argument that *Chevron* should not apply to immigration adjudications more generally. *See, e.g.*, *Denis v. Att'y Gen.*, 633 F.3d 201, 209 (3d Cir. 2011) (declining to apply *Chevron* deference to the BIA's interpretation of INA phrases that are "capable of definition"); *Higgins v. Holder*, 677 F.3d 97, 107–09 (2d Cir. 2012) (Katzmann,

First, the Attorney General's interpretation of § 1158(b)(2)(A)(iv) is not merely one reasonable reading of the statute—it's the only reasonable one. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). Mirza points to nothing that undermines the Attorney General's interpretation of "reasonable grounds." And we can think of nothing. To the contrary, numerous federal courts including our own routinely equate "reasonable grounds" and "probable cause" in the same way the Attorney General does. *See, e.g.*, *Draper v. United States*, 358 U.S. 307, 310 n.3 (1959) (equating "probable cause" with "reasonable grounds"); *Wong Sun v. United States*, 371 U.S. 471, 477–78 & n.6 (1963) (same); *Lozman v. Riviera Beach*, 138 S. Ct. 1945, 1957 (2019) (Thomas, J., dissenting) (describing a common law principle that equates "reasonable grounds" and "probable cause" as synonymous); *United States v. Banuelos-Romero*, 597 F.3d 763, 768 (5th Cir. 2010) (noting that "reasonable belief" coupled with evidence of wrongdoing "create[s] sufficient probable cause" (quotation omitted)); *United States v. Gorman*, 314 F.3d 1105, 1111 (9th Cir. 2002) (explaining that the "'reason to believe' standard . . . embodies the same standard of reasonableness inherent in probable cause"); *Adams v. Baker*, 909 F.2d 643, 649 (1st Cir. 1990) (holding that "'reasonable belief' may be formed if the evidence . . . is sufficient to justify a reasonable person in the belief that the alien falls within the proscribed category").

Mirza spends most of his effort disputing the Attorney General's interpretation of "a danger to the security of the United States." 8 U.S.C.

---

J., concurring) (arguing for a more circumspect application of *Chevron* to BIA interpretations of the INA that do not implicate the "BIA's administrative responsibility and expertise" (quotation omitted)); *see also* Shoba Sivaprasad Wadhia & Christopher J. Walker, *The Case Against* Chevron *Deference in Immigration Adjudication*, 70 Duke L.J. 1197 (2021). But our rule of orderliness prohibits that view. *See, e.g.*, *Avelar-Oliva v. Barr*, 954 F.3d 757, 770 (5th Cir. 2020).

§ 1158(b)(2)(A)(iv). The Attorney General interpreted this "danger" to mean any "non-trivial degree of risk," so long as there is sufficient information to "permit a reasonable person to believe that the alien *may pose a danger to the national security.*" *Matter of A-H-*, 23 I. & N. at 789 (emphasis added). Mirza says this sentence errantly lowered the "actual risk" standard required by the statute to a "speculative risk" standard implicated anytime anyone could hypothesize a potential risk.

Mirza is wrong. All dangers and all risks are inherently matters of probability. For example, a danger is an "[e]xposure or liability to injury, loss, pain, or other evil." *Danger*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 667 (2d ed. 1934; 1950) ("WEBSTER'S SECOND"). And a risk is a "[h]azard; danger; peril; exposure to loss, injury, disadvantage, or destruction." *Risk*, WEBSTER'S SECOND at 2154. Some risks (like smoking) are higher than others (like walking outside)—but they're still risks. The question is whether Congress required some particular quantum of risk before triggering the asylum bar. Mirza points to nothing in the statutory text or structure to suggest Congress did so.

Mirza instead points to two decisions from our sister circuits—*Yusupov v. Attorney General*, 518 F.3d 185 (3d Cir. 2008), and *Malkandi v. Holder*, 576 F.3d 906 (9th Cir. 2009). In *Yusupov*, for example, the Third Circuit concluded that an alien cannot lose asylee status merely because he "*may* pose a danger to the national security." 518 F.3d at 201. And our sister court suggested that *Matter of A-H-* erred in suggesting otherwise. *Ibid.* The Ninth Circuit later agreed with the Third and likewise suggested some of the language in *Matter of A-H-* was overbroad. *Malkandi*, 576 F.3d at 913–14.

We agree that a speculative risk is insufficient to trigger the statutory bar on asylum. But *Matter of A-H-* did not hold otherwise. Read in context, that decision said an alien can lose asylee status when a *reasonable person has*

*probable cause* to believe that an alien may pose a danger to national security. A purely hypothetical or speculative danger is not enough—just as the purely hypothetical or speculative risk of a crime does not provide a reasonable person with probable cause to think a crime occurred. *See Illinois v. Gates*, 462 U.S. 213, 238–39 (1983); *United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("The officer . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." (quotation omitted)). Instead, the Government must proffer evidence that the alien poses a non-theoretical risk to national security. We agree with the Third and Ninth Circuits that a wholly speculative risk is insufficient to trigger 8 U.S.C. § 1158(b)(2)(A)(iv)'s statutory bar on asylum. We just disagree that our reading of the statute contradicts *Matter of A-H-*.

The second reason *Chevron* is irrelevant is because the BIA determined that Mirza constituted an *actual* risk to national security. So *Matter of A-H-* is inapplicable and Mirza is ineligible for asylum even under his own preferred reading of the statute. The USCIS Notice of Intent to Terminate Asylum Status informed Mirza that his actions "*present a danger* to the security of the United States." The IJ presiding over Mirza's asylum revocation explained: "I believe with the evidence that we do have in this record, [Mirza] *does pose a danger* to the national security of the United States, and I will be terminating his asylum status." And the BIA adopted the IJ's reasoning and further clarified that "respondent *presented* a danger" to national security. Thus, Mirza is ineligible for asylum under any reading of § 1158(b)(2)(A)(iv), including his own.

B.

Mirza next contends the BIA erred in finding he constituted an actual threat to national security. Our review is for substantial evidence and we will reverse "only if the evidence is so compelling that no reasonable fact finder

could fail to find the petitioner statutorily eligible for relief." *Qorane v. Barr*, 919 F.3d 904, 909 (5th Cir. 2019) (quotation omitted). "We review the BIA's decision and will consider the underlying decision of the IJ only if, as here, it influenced the BIA's decision." *Munoz-Granados v. Barr*, 958 F.3d 402, 406 (5th Cir. 2020) (quotation omitted).

1.

Mirza first argues that his brother's anonymous phone call to APD couldn't provide "reasonable grounds" or "probable cause" to regard him as a danger to national security. Probable cause exists when the facts available would "warrant a person of reasonable caution in the belief" that the alien poses a danger to national security. *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quotation omitted). That standard is easily met here. A review of all available evidence supports the BIA's determination that there was probable cause to consider Mirza a threat to American's national security. Mirza told his brother "Allah is with me and I am going to kill at least 30 to 50 [non-believers]." Later, during a custodial interrogation, Mirza admitted to making the threat. Information about the threat, coupled with Mirza's own admission, provided reasonable grounds for regarding Mirza as an actual threat to national security.

2.

Mirza next claims that his threat was prompted by mental illness and that he lacked the sophistication necessary to pose a threat to national security. But he cites no authority suggesting that a different legal standard applies to the mentally ill. Nor does he show that his threat was objectively not a threat by reason of his illness. In fact, Mirza proffers no new evidence whatsoever tending to show his incapacity to commit an act of terror. Instead, he urges this court to reweigh the evidence and reconceptualize the threat as innocuous in light of his schizophrenia. That we cannot do. *See, e.g.*, *Newton*

*v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (holding substantial evidence review does not permit a court to "reweigh the evidence in the record, try the issues *de novo*, or substitute its judgment for the [fact finder's]").

3.

Mirza last claims that his threat was relatively minor in contrast to the serious threats posed by other terrorists. This argument borders on frivolous. The fact that other terrorists might have been more dangerous says nothing about whether Mirza satisfied the danger required in § 1158(b)(2)(A)(iv). He threatened to kill 30 to 50 non-believers. That is certainly a significant threat, regardless of the threats posed by other terrorists.

III.

After the termination of his asylum, Mirza filed applications for relief, including an application to adjust his status under 8 U.S.C. § 1159(b) and an application for withholding of removal under 8 U.S.C. § 1159(c). But the IJ found Mirza ineligible for both based on his membership in a terrorist organization, namely MQM. Mirza argues he is not a member of MQM. We first hold that we have jurisdiction to consider Mirza's argument. Then we hold it meritless.

A.

Jurisdiction first. The Attorney General argues that we lack jurisdiction to consider Mirza's challenge because Mirza did not raise the claim before the BIA, and "[f]ailure to exhaust is a jurisdictional bar." *Ramos-Torres v. Holder*, 637 F.3d 544, 547 (5th Cir. 2011).

We disagree. When reviewing final orders of removal, a question of law may be reviewed "only if the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). And petitioners "fail to exhaust their administrative remedies as to an issue if they

do not first raise the issue before the BIA, either on direct appeal or in a motion to reopen." *Omari v. Holder*, 562 F.3d 314, 318 (5th Cir. 2009). We have held, however, that "if the BIA deems an issue sufficiently presented to consider it on the merits, such action by the BIA exhausts the issue as far as the agency is concerned and that is all that 8 U.S.C. § 1252(d)(1) requires to confer our jurisdiction." *Lopez-Dubon v. Holder*, 609 F.3d 642, 644 (5th Cir. 2010) (quotation omitted); *cf. Brown v. Allen*, 344 U.S. 443, 447 (1953). Here, the Government clearly raised the issue in its appellate brief to the BIA. And the BIA addressed the issue of Mirza's terrorist-organization membership in its published opinion. So the claim was exhausted, and we have jurisdiction.

B.

Now the merits. Where the Government finds that an alien is a member of a Tier III terrorist organization, he is ineligible for asylum and cannot benefit from an adjustment of status to LPR unless he proves by clear and convincing evidence that he did not know (and had no reason to know) the organization was a terrorist organization. *See* 8 U.S.C. § 1159(b)(5); *id.* § 1182(a)(3)(B)(i)(VI). Here, the IJ found that Mirza had been an active member of MQM since 1987 based on three major pieces of evidence, all proffered by Mirza himself. Again, our review is for substantial evidence. *See Qorane*, 919 F.3d at 909.

First, Mirza's 1993 asylum application. In his initial asylum application, Mirza didn't simply list MQM as an affiliation but rather listed membership in the organization as the reason for the application.[3] Mirza

---

[3] It is true that Mirza was granted asylum in 1997 based on membership in MQM and is now being denied asylum on the basis of his membership in the same organization. But it is also true that Congress has significantly expanded the scope of the terrorism bar since 1997. In 1997, the terrorism bar applied only to "representatives" and "members" of terrorist organizations formally designated by statute or the Secretary of State. The Patriot Act of 2001 broadened the definition of "terrorist organization" to include "a group of two

claimed active membership in MQM and MSF. And he proffered evidence that the Pakistani Government abused MQM members, subjected them to unfair arrest and political retribution, and threatened to subject any member of MQM who returned to Pakistan from abroad to "a lifelong sentence." Thus Mirza's membership in MQM formed the basis for his asylum status.

Second, Mirza's 2019 application for withholding of removal listed four grounds for relief. One of them was "[p]olitical opinion." And Mirza specifically claimed that he had been "persecuted because of membership in . . . MQM."

Third and last, Mirza expressed his continuing support for MQM during his removal proceeding. Mirza told the IJ, "I am in favor of [MQM]." Mirza's brother-in-law informed an HSI investigator that Mirza and his relatives remained "supporters of the . . . MQM in Pakistan." And Mirza offered zero evidence that he was unaware that MQM is a terrorist organization.

This is more than substantial evidence to support the BIA's finding that Mirza was a member of MQM. No evidence he proffers compels an alternate conclusion. *See Qorane*, 919 F.3d at 909.

The petition for review is DENIED.

---

or more individuals" engaged in terrorism. Pub. L. No. 107–56, § 411, 115 Stat. 272, 347–48 (2001). And the Emergency Supplemental Appropriations Act for Defense, The Global War on Terror, and Tsunami Relief Act of 2005 extended the reach of the terrorism bar to "members" of such terrorist organizations. Pub. L. No. 109–13, § 103, 119 Stat. 231, 307 (2005). The IJ determined that MQM met this broader, post-1997 definition of "terrorist organization." It is irrelevant that MQM was not a terrorist organization in 1997, before Congress expanded the definition.